Leslie **CARR**, Plaintiff,

v.

**BOARD OF TRUSTEES OF the UNIVERSITY OF AKRON, et al., Defendants.**

**Civ. A. No. C78–42A.**

United States District Court, N. D. Ohio, E. D.

Jan. 8, 1979.

888

Staughton C. Lynd, Youngstown, Ohio, for plaintiff.

Edwin L. Parms, Marvin A. Shapiro, Akron, Ohio, for defendants.

MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Plaintiff initiated this action to redress the allegedly wrongful termination of his employment with the University of Akron. The Court duly heard testimony and received exhibits in July and August, 1978. The following shall constitute the Court's findings of fact and conclusions of law as

required by Rule 52, Federal Rules of Civil Procedure.

## PLEADINGS

The complaint filed by plaintiff asserts an action under 42 U.S.C. § 1983, the First, Fifth and Fourteenth Amendments to the United States Constitution, and the contract law of the State of Ohio. Reinstatement, injunctive relief, and damages are sought. The named defendants are the Board of Trustees of the University of Akron; Bernard I. Rosen, Chairman of the Board of Trustees; J. Guzzetta, President of the University of Akron; Carl A. Bersani, Chairman of the Department of Sociology of the University of Akron; and the following tenured members of the University of Akron Sociology Department: Charles M. Barresi, T. Neal Garland, Margaret M. Poloma, and Robert M. Terry. Defendants Rosen and Guzzetta are sued only in their official capacities, whereas the other individual defendants are sued both in their individual and official capacities.

Specifically plaintiff alleges three separate causes of action. First, he claims that his employment with the University of Akron was terminated by defendants in retaliation for the exercise of his right to academic freedom and free speech in violation of the First Amendment. Second, plaintiff asserts that in making a tenure decision prior to the completion of his probationary period without following the procedure required by the faculty manual, defendants deprived him of a valuable property right without due process of law in violation of the Fourteenth Amendment. Finally, he contends that such actions of defendants breached his contractual right to a full five year probationary period before a tenure decision was made, unless his employment was terminated in compliance with the faculty manual procedures.

Essentially defendants have denied the allegations of the complaint.

1. Doctors A, B, and C are pseudonyms which shall be used by the Court throughout to protect the identity of these three individuals who are not parties to this action and were not witnesses at the trial.

## JURISDICTION

The Court concludes that it has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343.

## FACTS

In 1970, the Ohio Board of Regents gave planning approval for a joint doctoral program in sociology to be offered by the University of Akron (hereinafter the university) in cooperation with Kent State University. As a result, the university employed defendant Robert M. Terry as chairman of its sociology department in September 1971. Dr. Terry was hired specifically to upgrade the department and develop the doctoral program. Thus from at least the March 1973 preliminary accreditation of the doctoral program by the North Central Association of Colleges and Schools, it was the policy of the sociology department to strongly encourage scholarly research and publication by its members.

Concomitant with the initiation of the joint doctoral program, the sociology department experienced a substantial growth in its faculty. In 1972, six professors were hired including Dr. Richard J. Gigliotti, Dr. David J. O'Brien, Dr. A, Dr. B, and Dr. C.[1] The following year two additional professors including plaintiff were employed in the sociology department.

In early 1973 plaintiff Leslie Carr visited the university as part of the interview process for a faculty position. During such visit he met most of the members of the sociology department and gave an informal presentation on his research. Plaintiff informed Dr. Terry that his approach to sociology was conflict oriented and that he planned to use Marxian theory in his classes.[2] Drs. Barresi, Bersani, Garland and O'Brien were at this time also aware of

2. There are two schools of thought in contemporary sociology: conservatism or functionalism, and conflict theory. Although conflict theory includes Marxism, it is possible to have a conflict viewpoint without being Marxist oriented.

plaintiff's position; Dr. Bersani viewed his perspective as a plus or bonus since the department lacked a person with good training in conflict orientation.

Of the fourteen written faculty evaluations submitted to Dr. Terry after plaintiff's visit, eleven were positive and favored approval of plaintiff for a position in the sociology department. All five of the named defendant members of the department recommended that plaintiff be hired. Essentially, the department recommendation that plaintiff be offered a position was made for two reasons. First, plaintiff's areas of specialization include race relations, stratification, political sociology and theory. Since the department lacked depth in each of those areas, acquiring plaintiff's services was seen as a means of resolving the problems created by the demands for course offerings therein. Second, plaintiff had already published an article and a reply in the leading sociological journal, the American Sociological Review. Such was considered an impressive accomplishment and an indication that in the future he would make significant contributions in the area of scholarly research and publication. In view thereof plaintiff met the department's concern with and need for a substantial increase in quality publications.

The sociology department's recommendation having been approved, Robert A. Oetjen, dean of the college of arts and sciences, by a letter dated March 29, 1973, invited plaintiff to join the staff of the department as an assistant professor commencing September 15, 1973. Upon receipt of such offer plaintiff wrote Dr. Terry requesting that the additional terms discussed during his visit to the university be reduced to writing. In said letter of April 5, 1973 he also stated that he would receive his doctoral degree in June and planned to spend a good part of the summer writing up his dissertation for publication. It appears, however, that such has not been published in any form to date.

By letter of April 9, 1973, Dr. Terry promptly responded to plaintiff stating, in pertinent part:

Finally, the length of the contract is one year. This is due to the powers above me. The expectation, however, is that you will stay with us more than a year. In fact, I find it hard to believe that we could have so misjudged you that you would not stay longer. In indicating that it is a one year contract, however, I should point out that it is not a one year position. The position is a continuing one and the hopes and expectations of all are that you would do the kinds of things in the way of teaching, research and participation in departmental activities that would help us to become a better sociology department and you to become a better sociologist.

Thus with regard to contract length, Dr. Terry was merely advising plaintiff of university policy as set forth in the regulations of the board of trustees and the faculty manual. Specifically such policy provides that instructors, assistant professors, associate professors and professors shall be appointed for an initial period of one year. Thereafter instructors and non-tenured faculty are subject to annual reappointment if their continued service is desired.

The terms of the offer being agreeable to plaintiff, the board of trustees appointed him as assistant professor of sociology for the 1973–74 academic year. Such certificate of appointment constituted plaintiff's employment contract with the university. It specifically provided that:

Services of the faculty are to be rendered in accordance with established policies of the University as set forth in the Bylaws and Regulations of the Board of Trustees and The University of Akron Faculty Manual or as specifically agreed upon and set forth below.

The only additional term set forth in plaintiff's contracts with the university was a provision in his initial contract for partial reimbursement of moving expenses.

During the summer prior to his coming to the university, plaintiff wrote Dr. Terry to request that eight books be placed on order by the campus bookstore for the fall semester. Among these books were Gerhard

Lenski's *Human Societies*, a conflict oriented text, and Karl Marx and Fredrich Engels' *The Communist Manifesto*. Plaintiff also prepared a paper entitled "A Primer on Marxian Theory" for use in conjunction with his teachings at the university. Dr. Terry was aware thereof, and although Article D, § 23 of the faculty manual provides that selection of texts is the prerogative of the instructor subject to departmental policies, no attempt was ever made to dissuade or prevent plaintiff from utilizing either this paper or any other writing in his courses.

In his first year at the university, 1973–74, plaintiff was recommended for appointment to the graduate faculty by Dr. Terry. Such appointment was not automatic, but rather was based upon the individual's activities. On November 28, 1973, plaintiff received a three year appointment to the graduate faculty of the university. By its terms, such appointment was effective September 1, 1973 and expired August 31, 1976.

Plaintiff was informed by an undated memorandum to all faculty from Dr. Terry that salary recommendations for 1974–75 were submitted to the dean in February 1974. Said "recommendations were based upon three general criteria: teaching, publication, and departmental and university service." (Dx H). Plaintiff was recommended for a seven hundred dollar increase in his salary. He in fact received such increase as is evidenced by his second one year contract with the university for the 1974–75 academic year, dated April 24, 1974.

By memorandum dated May 6, 1974, Dr. Terry requested that all faculty submit materials for the annual report. It was and is the practice of the sociology department to solicit from each of its members all relevant information regarding their activities for assemblage into an annual report. Such report documents the work of the department for the university administration and influences, inter alia, the department's budget and teaching load. The specific information requested of all faculty includes scholarly publications and university and community activities.

Dr. Terry next requested in a memorandum of May 7, 1974 that each untenured member of the faculty submit all information regarding their activities for purposes of review and evaluation by the tenured faculty. As stated therein, such information should include copies of publications and papers in progress, a statement of work in progress, information regarding teaching proficiency, and a statement of department, university and community service.

Thus during his first year at the university plaintiff received at least three memoranda indicating that scholarly publication, teaching, and university and community service were the three criteria utilized by the department in its evaluative processes.

Pursuant to the advice of Dr. Terry during his first year at the university, plaintiff applied for and received a research grant to conduct studies in Lorain, Ohio. Such were conducted with the assistance of sociology students in the summer of 1974. The data gathered therefrom was to serve as the basis for several future articles.

In the 1974–75 academic year, decisions regarding retention, promotion and tenure were made by the sociology department earlier than usual in order to comply with the Buchtel College of Arts and Sciences Guidelines for Departmental Recommendations for Promotion, Tenure and Reappointment, adopted April 25, 1972 and amended October 8, 1974. Said guidelines adopted a new timetable dealing with the decision-making process, and set forth certain general principles and procedures that should be followed by each department.[3] Although

---

**3.** The Buchtel College Guidelines provided, in pertinent part, as follows:

  1. The guidelines used by each department should be formally adopted by a majority vote of the faculty of each department. The guiding principle is democratic participation in departmental affairs.

  2. a) Departmental committees considering promotion, tenure and reappointments should be structured to include as large a membership as is appropriate.

the sociology department did not follow the guidelines exactly, the department's practices were in substantial compliance therewith. In that regard, the department had approved on November 5, 1971, more than five months before adoption of the college guidelines, a document entitled "Criteria and Procedures for Tenure and Promotion."

Thus in a memorandum to all faculty dated October 10, 1974, Dr. Terry called for a meeting of tenured faculty on October 25, 1974, for the purpose of considering tenure and reappointment matters. At such meeting defendant Barresi was elected chairman of the tenure committee, and as was its usual practice, the committee first reviewed retention matters beginning with those in their first year on the faculty, and then separately considered tenure decisions. It was determined that plaintiff who was in his second year be recommended for reappointment for a third year. With regard to five of the individuals hired in 1972, and who were thus in their third year, the Committee also recommended reappointment. With the exception of Dr. O'Brien, however, they all received warning letters from the committee.

In the case of Dr. Gigliotti and Dr. B, the tenure committee noted that their current record of publications in print was inadequate and needed attention. Both were thus to be reviewed again during the winter quarter. Further, the committee found that Dr. A lacked both publications in print and an indication of concrete work in progress. Therefore, he was apparently warned that unless his record improved substantially by the end of the fall quarter, the question of reappointment would be reviewed. Finally, with regard to Dr. C, the committee reasoned that his publications should be much better in view of his minimal involvement in other areas of departmental activity. Dr. C was likewise to be reviewed in the winter quarter.

At its meeting of October 25, 1974, the tenure committee also decided to recommend that Dr. Terry who was then in his fourth year with the sociology department be granted tenure. According to the regulations of the board of trustees and the faculty manual, assistant professors, associate professors, and professors "may be appointed to indefinite tenure after at least one year of service in a professional capacity" at the university. Further, indefinite tenure must be granted not later than the end of the fifth year of service; if after five years tenure is not granted, the individual is to be given notice that his employment terminates at the end of his sixth year of service. Despite these provisions and the department's recommendation, the university declined to grant Dr. Terry "early tenure," that is tenure to be effective with the commencement of his fifth year of service, the 1975–76 academic year.

The tenure committee meeting for the 1975–76 academic year was held on October 17, 1975. At that time the committee again

b) In the case of promotion, committees consisting of all full-time departmental members of the rank to which promotion will be made and all higher ranks appears desirable and is widely acceptable.

c) In the case of reappointment, committees should be the same or as broadly structured, as for tenure decisions. The rationale is clear, since decisions on non-reappointment are in effect tenure decisions.

d) In the case of tenure decisions, the appropriate committee shall be the tenured members of the department.

3.  a) Prior notice of at least one week should be given to all full-time department members, of meetings to consider promotion, tenure or reappointment.

b) All faculty should have the opportunity, in advance to submit material they wish the appropriate committee to consider. The candidate should have an opportunity, upon his request or that of the committee, to meet with the appropriate committee during their deliberations.

.    .    .    .    .

6.  Results of committee votes should be transmitted in writing and without undue delay to the candidate under consideration.

7.  Criteria for promotion should be published in the guidelines of each department so that candidates will know the criteria which must be met or exceeded. The criteria must be set by each department, since each department will have different requirements because of its unique structure, but these criteria must be stated.

unanimously recommended that Dr. Terry be granted indefinite tenure. Each of the four faculty members then in their fourth year, who had received warning letters in their third year, showed additional publications. Dr. Gigliotti's 1975 vita revealed two more co-authored articles and one new article. Similarly, Dr. C's 1975 vita listed in addition to his previous publications a co-authored article, a co-authored reply, and one article. As a result, the tenure committee recommended that they be commended on their progress and be encouraged to continue. Although Dr. B's vita revealed apparently four additional co-authored articles, the committee indicated that he needed to improve his publication record and informed him of specific weaknesses in his teaching.[4] Dr. A's 1975 vita listed apparently his first publications, one research note and one article. Thus, the tenure committee again warned him that his publication record needed to be substantially improved or he would not be reappointed after next year. Actually, the committee vote in 1975 was one vote short of recommending a terminal contract for Dr. A in that, his fourth year.

With regard to plaintiff who was then in his third year, the tenure committee noted that he had been very active in research activities, but needed to improve his publication record. Plaintiff's October 1975 vita listed only one additional entry under scholarly publications since his coming to the university. This was an article entitled "Amomie and Religiosity: An Empirical Re-examination" which he co-authored with William Hauser and which subsequently appeared in the March 1976 *Journal for the Scientific Study of Religion*.[5] The committee was therefore apparently concerned with the substantial lack of publications by plaintiff.

Additionally, defendants Garland and Paloma together with at least two other members of the tenure committee expressed concern over student reports they had received regarding plaintiff's teaching. Apparently in informal discussions with these professors, a small number of students commented that plaintiff's presentation was biased toward a single viewpoint or perspective. The committee, not having confirmed or verified these reports, nonetheless was of the opinion that plaintiff should be apprised thereof.

Therefore, by letter of October 24, 1975, Dr. Barresi as chairman of the tenure committee informed plaintiff of the committee's evaluation and concerns. Said letter specifically advised plaintiff as follows:

The tenured faculty met on October 17, 1975 and evaluated the materials which you submitted for review. Your past publication record was favorably noted, but concern was expressed that there should be substantial improvement for the future. There is also continued need to become involved in departmental and college level activities.

There was also concern expressed with student reports that your teaching tends to center on a limited perspective and does not offer sufficient coverage of other perspectives in sociology. There is a need for you to attain a more open-minded and more responsive atmosphere in the classroom so that students will not perceive that only a limited set of responses will be favorably regarded.

As colleagues we are interested in your career development and I will be happy to clarify or discuss with you any matters in this regard.

Thus plaintiff was put on notice of the matters reviewed by the committee and the areas in which he needed to improve.

Plaintiff was deeply troubled by the tenure committee's letter as he felt that his teaching was being unjustly attacked. He thus proceeded to discuss the letter with six tenured faculty and Dr. O'Brien. Plaintiff talked with defendants Paloma and Garland

---

4. Dr. B's publication record at that time consisted of five co-authored articles; he had yet to produce an article on his own.

5. For purposes of departmental evaluation, articles accepted for publication were given the same weight as articles actually in print.

who both acknowledged receiving comments critical of his teaching and felt that they had an obligation to inform him thereof. Dr. Garland told plaintiff that while six students had criticized his race relations course, about twice that number of students had made positive comments regarding it. In reviewing the letter with Dr. Paloma, plaintiff claimed that his right to teach Marxism was being infringed. In the apparently heated discussion that ensued he professed that Marxism was his religion and Dr. Paloma told him that he could not teach Marxism as a religion in the classroom anymore than she could teach Christianity. Dr. Paloma, however, did not know what plaintiff did in his classroom, and was not influenced against him because of this unfortunate emotionally charged encounter.

Defendants Terry, Barresi, and Bersani each told plaintiff that he should be concerned about his research and publication record rather than the comments regarding his teaching. Plaintiff admitted to each of them that he was not satisfied with his publication record and that it was not up to his own standards. He clearly recognized and acknowledged that his publications were insufficient, and that he needed to publish more. Yet plaintiff persisted in his concern over the comments that his teaching was from a limited perspective. He did so despite the fact that the majority of the six tenured faculty with whom he spoke thought his interpretation of the letter was incorrect; the letter was meant to be constructive and not an attack upon plaintiff. Thus they advised him to concentrate on his publications. Plaintiff, however, was not really concerned with his publication record believing that he had five years in which to compile a sufficient one. This belief was apparently founded upon the university regulation providing that tenure decisions had to be made at the end of five years of service.

Although the university regulations authorized the award of indefinite tenure prior to the completion of five years service, as stated above, the Court finds that the policy and practice of the university was generally not to award such early tenure. Tenure decisions were thus usually not made until at least the beginning of a person's fifth year in the sociology department.[6] Such practices, however, did not guarantee any untenured faculty member a full five years of employment. An untenured faculty member was subject to annual reappointment, and if his performance was unsatisfactory, he could be terminated. Plaintiff himself admits that he had no right to employment for a full five years.

Since the tenure committee letter of October 24, 1975 made no mention of reappointment, plaintiff wrote Dr. Terry regarding same. In a memorandum of October 30, 1975, Dr. Terry informed plaintiff that the tenure committee had recommended his reappointment for the 1976–77 academic year on a continuing basis. Plaintiff further requested of the tenured faculty information concerning the student reports mentioned in their letter, and an opportunity to appear before the committee. These requests were denied.

Later in the 1975–76 academic year, the general dissatisfaction of graduate students with the sociology department became apparent. Two issues of particular concern to a number of such students arose in the spring of 1976. These issues involved a religious study group, and the textbook selection for graduate teaching assistants. Plaintiff claims that his expressions of concern regarding such issues was one of the motivating factors in defendants' decision not to retain him.

The issue of religious proselytizing arose out of a note sent by defendant Paloma on university interoffice stationery which invited a student to join Drs. Barresi, O'Brien and herself at a scripture sharing meeting. Upon learning of this matter, plaintiff approached Dr. O'Brien and inquired about such religious activity. Dr. O'Brien told plaintiff that it was none of his business, and that faculty members could engage in

---

**6.** The one exception of course occurred when Dr. Terry was recommended for tenure in the beginning of his fourth year as discussed previously.

religious group activities. Plaintiff, however, was opposed to and objected to the religious invitation viewing it as coercion upon a student to participate in such religious activity. After this unfriendly discussion, Dr. O'Brien spoke with defendants Barresi and Paloma regarding it. Plaintiff, however, never approached either of these defendants regarding his concerns.

Plaintiff also discussed this religious issue with Dr. Terry and Dr. C; both agreed that said invitations should not be given. Dr. Terry informed plaintiff that he had already received several complaints about the matter. Subsequently by memorandum of May 5, 1976, Dr. Terry informed Dr. Paloma that, after having extensive discussions with graduate students, he felt any semblance of coercion must be eliminated. He therefore requested that she not solicit participation in her religious activities, unless she had a clear statement of interest from a student and was sure that student could not imply any coercion therefrom.

The second issue to surface in the spring of 1976 involved the textbooks to be used by graduate teaching students. In a memorandum to all graduate teaching assistants, dated June 3, 1976, Dr. Garland stated that all sections of the introductory sociology course taught by teaching assistants would be required to use the same basic textbook. This text was to be chosen by a majority vote of those assistants who would be teaching such course from a list prepared by the supervisory committee for graduate teaching assistants. Each assistant, however, was encouraged to use a paperback or book of readings of his own choice in conjunction with the text.

Having heard complaints about the above described situation, plaintiff on his own discussed same with defendants Garland and Terry who together with defendant Barresi comprised the graduate student committee. He apparently voiced the students' concern that the list was limited and should contain more conflict oriented books. Plaintiff, however, was not the only faculty member to express his disapproval of the procedure. Dr. Gigliotti told defendants Barresi, Garland, and Terry that he felt graduate students should be allowed to choose their own textbooks.

In both the religious activity and textbook matters, plaintiff appears to have been concerned with the issue of academic freedom. Such apparently prompted him to speak with other faculty members. The Court finds that plaintiff was not requested by the students in the sociology department to intercede with the tenured faculty on their behalf regarding either matter. Further, the Court finds that all of the defendants were not fully aware of plaintiff's involvement in both matters during the spring of 1976. Defendants Paloma, Barresi, and Terry knew of plaintiff's concern over the religious issue, while only defendants Garland and Terry had spoken with him regarding the textbook matter.

On June 15, 1976, at the close of the 1975–76 academic year, plaintiff was reappointed to the graduate faculty of the university. As with his initial appointment, such was to be effective for a three year term. Also in June 1976, defendant Bersani became acting chairman of the department of sociology.

During the 1976–77 academic year, the tenure committee met on November 5, 1976, and elected defendant Bersani as its chairman. At said meeting, the committee decided to recommend that Dr. Gigliotti, Dr. O'Brien, and Dr. C, all of whom were beginning their fifth year of service at the university, be awarded indefinite tenure. The committee determined, however, that Dr. A and Dr. B, who were also in their fifth year, should not be recommended for tenure, but should be given terminal contracts.[7]

At this time plaintiff was beginning his fourth year at the university, and thus the question of his retention or reappointment

7. It is the policy of the university to grant a faculty member who is not to be retained or awarded tenure an additional year of employment under a terminal contract. The purpose thereof is to afford the individual an opportunity to secure other employment while still employed.

was considered by the tenure committee. As per plaintiff's request the committee reviewed student government evaluations of his courses, and Dr. Terry presented summaries of graduate student evaluations of his teaching.[8] The majority thereof appear to have been favorable to plaintiff, and thus his teaching was not a negative factor. In the year since the last tenure committee meeting and the October 24, 1975 warning letter, however, plaintiff had no new publications in print or papers accepted for publication. Thus, unlike each of the four faculty members discussed above who also received warning letters in their third year and thereafter proceeded to produce additional publications prior to their fourth year review, plaintiff wholly failed to improve his publication record.

After review of all the materials presented by plaintiff, the tenure committee voted nine to one to recommend that he be given a terminal contract. The sole dissenting vote came from defendant Paloma who was unable to attend the meeting and had thus cast her vote prior thereto. Dr. Paloma voted for reappointment with caution believing that plaintiff should be terminated since his publications were insufficient, but giving him the benefit of the doubt since she could not be present for the evaluation meeting.

■ Upon consideration, the Court finds that the tenure committee's decision not to recommend reappointment for plaintiff was based solely upon his publication record. Since coming to the university, plaintiff had only one additional publication in print. In view of the evidence presented regarding the publication records of other similarly situated faculty members, the Court cannot conclude that the defendants' determination regarding the deficiency of plaintiff's record was unreasonable or without support. Further, the Court finds that plaintiff's teaching perspective, and in particular his

Marxist viewpoint, and his expressions of concern regarding student rights were not discussed or considered at the tenure committee meeting, and did not form any basis for the committee's decision. Also, the Court specifically finds that the individual defendant members of the committee were not motivated, in whole or in part, to vote for nonretention by such actions of plaintiff.

Thereafter by letter of November 23, 1976, Dr. Bersani informed plaintiff of the tenure committee's decision. He indicated that plaintiff's publication record was less than what could be considered minimally acceptable, and noted that, from 1973 to date, plaintiff's publications actually in print consisted of one joint article which was produced prior to the committee's letter calling for substantial improvement. Dr. Bersani further stated that plaintiff's publications in print fell far short of any other untenured faculty member, and thus his achievement in one of the areas key to a doctoral department had not met the criteria established by the faculty. Finally, Dr. Bersani advised plaintiff that the tenure guidelines required him to also verbally communicate this decision and inform plaintiff of the available appeals process.

■ Plaintiff and defendant Bersani subsequently met in the latter's office on November 30, 1976. Thereat Dr. Bersani explained that plaintiff's publications since 1973 were not satisfactory, and that such fact alone was the ground for the committee's decision. He further informed plaintiff that the article published prior to his employment at the university was the basis for the hiring decision, and thus was given little weight in the evaluation process. Dr. Bersani also told plaintiff that a co-authored article was not considered equal to a single author publication since it represented the work of more than one individual.

---

8. In a memorandum to all graduate students dated May 5, 1976, Dr. Terry stated that, as a result of their meeting, he agreed to provide them with an opportunity to evaluate courses in the department. Subsequently such course evaluations were reviewed and summarized by Dr. Terry, and then destroyed in order to protect the students' privacy. He was, however, willing to share the summaries with the tenure committee upon Dr. Carr's request in order to aid the evaluation process.

The Court cannot find that these standards of judgment applied by those more familiar with the academic realm are arbitrary or unreasonable.

During their meeting defendant Bersani gave plaintiff a copy of that part of the faculty manual which dealt with reappointment and the procedure upon termination of an appointment. Specifically, division B, section 10 outlines the procedure whereby an untenured faculty member is invited to confer with the dean and later the president of the university. He also gave plaintiff a copy of the sociology department's "Criteria and Procedure for Tenure and Promotion," which was approved in 1971 and constituted its guidelines.

Pursuant to the sociology department's policy and upon his request, plaintiff was accorded an appeal meeting by the tenure committee. He was permitted to submit a statement and any other material he deemed appropriate for the committee's consideration. At the meeting held on January 7, 1977, however, the tenure committee affirmed its original decision to recommend that a terminal contract be awarded plaintiff.

At sometime prior to the tenure committee's appeal meeting, plaintiff reviewed the faculty manual and apparently discovered for the first time section 16 of division B, entitled "Guidelines for Promotion, Tenure, Retention and Initial Appointment." [9]

9. Section 16 provides as follows:

This statement was adopted by University Council on April 26, 1973 as follows:

1. a. Each department * should have a set of procedures concerning promotion, tenure, retention, and initial appointments.

b. The procedures should be prepared by each department * and should be formally approved by that department.

2. Irrespective of differences between departments (size, numbers in various ranks, professional guidelines), each document should contain the following as minimum provisions:

a. A general introduction, including a statement of the responsibilities and goals of the department * or college.

b. Separate procedures on promotion, tenure, retention, including appropriate committees for each.

c. Each candidate under consideration and the committee members should receive at least two weeks' notice of the meeting. The purpose of the meeting and other details should be explained in writing.

d. The department head will call the initial meeting of each appropriate committee, at which time the committee will elect its own chairman. If the department head does not otherwise qualify to be a member of a committee, he shall be a member ex officio so that he may provide information and explain his views concerning the candidate.

e. The candidate should be invited to submit a vita and other professional data, and should be invited to meet with the committee before a recommendation is made. This recommendation shall be reached by secret ballot.

f. The candidate should be notified, in writing by the department * head of the committee's recommendation as soon as possible after a decision is reached, with a copy of such recommendation to the committee chairman.

g. The department * head shall transmit copies of the committee's recommendation to the Dean and Vice President and Provost, whether or not the departmental head concurs. He or she shall, however, be free to make a separate recommendation, but if it differs from that of the committee the head must discuss this with the committee, and a copy of such recommendation sent to the faculty members concerned.

h. Criteria for promotion, tenure, and retention need clear definition.

i. Composition of the committees for recommendations should be as follows: recommendations on promotion shall be made by at least all tenured faculty members within the department, and who are at rank or higher than that for which the candidate is being considered. Any person on such a committee should have served at least one year at The University of Akron in the department. A tenure recommendation committee shall be composed as stated in the *Faculty Manual.* A retention recommendation committee shall be composed of at least all the tenured members of the departmental faculty who hold a rank equivalent to or higher than that of the candidate.

j. An appeal or review procedure shall be established by each college.

k. With the exception of tenure recommendations (see *Faculty Manual*), if there are not sufficient personnel with the necessary rank to form a committee to make recommendations, advice should be obtained from outside the department.

*l.* Initial appointments should involve the entire full-time faculty of the department * and should include appointment of a search committee, circulation of vitas, review of any scholarly work, an interview with departmental faculty, and, where appropriate, presentation of seminars.

Such consisted of a statement adopted by the university council, the university's legislative body, on April 26, 1973. These guidelines are actually general recommendations to be reviewed by each college and are not mandatory. In other words, they recommend a basic or standard approach to be followed by each college in matters of promotion, tenure and retention, but recognizing the need for flexibility in the colleges, do not mandate any particular procedure.

Thereafter, plaintiff made known to defendant Bersani his view that section 16, division B of the faculty manual mandated the use of separate committees and guidelines for retention and tenure decisions. Dr. Bersani accordingly sought the advice of Dean Oetjen of the college of art and sciences. Despite his disagreement with plaintiff's position or interpretation, Dean Oetjen recommended that the sociology department establish both a separate retention committee and separate retention guidelines. Said guidelines were subsequently drafted and adopted by a twelve to five vote of the department's faculty. On February 3, 1977, the retention recommendations committee which was comprised of all tenured faculty met and elected defendant Bersani as its chairman.

In a memorandum of February 5, 1977, defendant Bersani informed the three faculty members, who had previously been reviewed for retention by the tenure committee on November 5, 1976, that they would be reviewed for such recommendation by the retention committee on February 25, 1977. He also requested that they submit whatever materials they deemed appropriate, and invited them to meet with the committee if they so chose.

As scheduled, the sociology department retention recommendations committee met on February 25, 1977, and plaintiff appeared before them. By this time, he had

been informed, by letter of February 16, 1976, that a manuscript co-authored with Neal Krause was accepted for future publication as a research note.[10] Such letter was submitted to the retention committee. Thus, since coming to the university, plaintiff had added a co-authored article and a co-authored note to his publication record. The committee, however, determined that such was insufficient, and thus unanimously recommended that plaintiff be given a terminal contract.

Upon consideration, the Court finds that the sociology retention recommendations committee accorded plaintiff a de novo review and evaluated him as of February 25, 1977. Further, the Court finds that the committee's recommendation was based solely upon plaintiff's publication record. The Court also finds that the retention committee did not discuss, consider or base its decision, in whole or in part, upon plaintiff's teaching perspective or expressions of concern regarding student rights. The Court cannot conclude under the circumstances presented herein that the committee's action was unreasonable.

After being informed of the retention committee's decision and pursuant to division B, section 10 of the faculty manual, plaintiff met with Dean Wingard, acting dean of the college of arts and sciences in Dean Oetjen's absence, on March 10, 1977. Subsequently by letter of March 17, 1977, Dean Wingard informed plaintiff of his intention to forward to the president of the university his recommendation that plaintiff be given a terminal contract for 1977–78. It was the dean's conclusion, after a thorough review of the record, that plaintiff's publication record was not sufficient for retention. In that regard he noted that plaintiff had not been overburdened by his teaching load or university demands which

---

m. Some departments * may wish to have two or three members of the department elected to work with the department head in salary adjustments.

* Or division or college, where appropriate.

**10.** In response to his letter of November 17, 1977, plaintiff was advised, by letter of November 25, 1977, that this paper was then to be published as a regular article and not a note as originally planned. It is readily apparent, however, that such development did not occur until nine months after the retention committee decision.

would have prevented him from publishing. Dean Wingard further stated that he found the procedures and processes used to be in compliance with university requirements as set forth in the faculty manual. In accordance therewith, a second meeting between plaintiff and Dean Wingard was scheduled for March 18, 1977, and he notified plaintiff that his mind was still open.

During their discussions, Dean Wingard suggested that plaintiff obtain outside evaluations of his scholarship. Pursuant to such suggestion, plaintiff approached Dr. Paul Sites, chairman of the Department of Sociology and Anthropology at Kent State University, and requested his assistance. As a result thereof, five of the more than thirty members of the Kent State sociology department submitted written evaluations of plaintiff's publication record. Four of these evaluations were reviewed by Dean Wingard and all were generally favorable to plaintiff. As pointed out by Dr. Sites in his letter to defendant Bersani, however, this was a matter on which they could honestly disagree.

While Dean Wingard was reviewing the matter several events occurred. Initially concern over plaintiff's situation had become highly visible. On March 11, 1977, the graduate student council, the representative body for such students at the university, wrote defendant Bersani requesting all pertinent information regarding plaintiff's dismissal. Dr. Bersani was also sent a memorandum dated March 17, 1977 by Committee S of the Akron Chapter of the American Association of University Professors. Said committee, charged with responsibility of the academic freedom of students, was concerned over persistent reports that the graduate students in the sociology department were being forced to take a position regarding plaintiff's situation. Dr. Bersani's comments thereon were thus solicited. Further, Dr. Bersani was informed, by letter of April 7, 1977, that plaintiff had formally requested that Committee A, on Academic Freedom and Tenure, of the Akron Chapter of the American Association of University Professors, examine the decision of the department's retention recommenda-

tions committee. Therefore, the committee invited Dr. Bersani to meet with it.

Another event which occurred prior to the completion of Dean Wingard's review, was the April 4 through 6, 1977 visit of a committee for the Commission on Institutions of Higher Education of the North Central Association of Colleges and Schools. Said visit was for the purpose of conducting a comprehensive evaluation to establish whether the university could be recommended for continued accreditation at the doctoral level. Although certain graduate students from the sociology department had been chosen to meet with the visiting committee, other students disenchanted with the department and its decision regarding plaintiff were also able to meet with the committee after appealing directly to its members. In its report on the visit, the committee concluded that the university's graduate programs are of acceptable quality and appear to be generally well conducted with one exception, the graduate program in sociology. As evidence of the program's problems, the committee specifically noted the complaints of the graduate students and indicated that such appeared sufficiently serious and widely held so as to merit attention.

By letter of April 15, 1977, Dean Wingard informed plaintiff of his recommendation to President Guzzetta that plaintiff be given a terminal contract for the 1977–78 academic year. In making this decision Dean Wingard examined all materials submitted by plaintiff and made an independent evaluation thereof. In so doing he did not consider either plaintiff's expressions of concern for student rights or plaintiff's teaching perspective; he knew nothing about plaintiff's political background.

Upon receipt of Dean Wingard's recommendation, defendant Guzzetta met with plaintiff. Thereafter, President Guzzetta obtained plaintiff's material from Dean Wingard and separately conferred with both the latter and defendant Bersani. Although plaintiff informed President Guzzetta of his Marxist perspective, defendant

Guzzetta's discussion with defendant Bersani did not include any mention thereof or of plaintiff's expressions regarding the religious issue or the textbook matter. Before making his decision, President Guzzetta was sent a copy of a document entitled "Committee A report on the case of Dr. Leslie G. Carr." The committee concluded that the sociology department had failed to properly adopt and follow appropriate procedures and criteria for retention. President Guzzetta, however, recommended to the defendant board of trustees that plaintiff be given a terminal contract which recommendation was followed by the award of such contract on May 18, 1977. The Court finds that defendant Guzzetta's decision was based upon his review of plaintiff's record and the above described conferences, and not upon plaintiff's teaching perspective or expressions of concern for student rights.

In June 1977, plaintiff began work on his second article with Neal Krause based on the data gathered in the Lorain survey of 1974. Said article was accepted for publication by September 1977. Also by letter of August 12, 1977, plaintiff was informed that a paper entitled "Michaels Re-Examined" and co-authored with Peter J. Strub had been accepted for publication. Thus plaintiff claims that his publication record by the beginning of his fifth year was sufficient to warrant the award of indefinite tenure.

On October 3, 1977, plaintiff filed a grievance with the Faculty Rights and Responsibilities Committee. At its meeting of October 28, 1977, said committee voted seven to one to reject plaintiff's grievance; it was the consensus that there were sufficient grounds to issue a terminal contract, and that the criteria utilized by the sociology department were fair, objective and free of undue influence from inappropriate factors. Further, the committee believed that, although the department initially did not establish retention procedures in conformity with university regulations and follow university guidelines for retention, plaintiff was afforded an adequate opportunity to be heard.

Finally, it appears that plaintiff has sought employment with a number of universities throughout the United States and in Canada. As of the present time the Court has not been informed that such efforts have proven successful.

## DISCUSSION AND CONCLUSIONS OF LAW

As previously stated, plaintiff has set forth three claims for relief. The Court shall address each separately.

Initially, plaintiff alleges that his termination constituted a violation of his rights to procedural due process under the Fourteenth Amendment to the United States Constitution. He contends that the policies and practices of the university implied a right to a full five year probationary period unless terminated in accordance with the faculty manual, thereby creating a property interest in continued employment.

■ The safeguards of procedural due process apply only to a deprivation of those property interests encompassed by the Fourteenth Amendment. To have a protectable property interest in a benefit, a person must have a legitimate claim of entitlement to it. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Such claims are derived from state law; as stated by the Supreme Court:

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* Thus a person's interest in a benefit constitutes a property interest subject to procedural due process if there exists rules and understandings which justify his claim of entitlement thereto. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■■ A property interest in continued employment may be created by statute, by an express contract, or by an implied contract. The latter two concepts have been explained by the Supreme Court as follows:

A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient "cause" is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a "property" interest in re-employment. For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be "implied." 3 A. Corbin on Contracts §§ 561–572A (1960). Explicit contractual provisions may be supplemented by other agreements implied from "the promisor's words and conduct in the light of the surrounding circumstances." *Id.,* at § 562. And, "[t]he meaning of [the promisor's] words and acts is found by relating them to the usage of the past." *Ibid.*

*Perry, supra* at 601–02, 92 S.Ct. at 2699. In any event, the sufficiency of a claim of entitlement to continued employment must be determined by reference to state law. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

In the case at bar it is clear that plaintiff's certificates of appointment specified that his employment was for one academic year. As an untenured member of the faculty he had no right to reappointment, and such was not conferred upon him by expressions that the position was a continuing one. Said expressions merely indicated that plaintiff's appointment was renewable if his performance was deemed to be satisfactory. As plaintiff himself admitted he had no absolute right or guarantee to reappointment.

■ Plaintiff, however, asserts a property interest in a full five year probationary period unless terminated in a manner consistent with the faculty manual. He argues that the well-established policy and practice of the university created a reasonable expectation of five years employment before a tenure decision was made. Plaintiff's claim of entitlement thereto is allegedly derived from two specific sources: the custom of the university not to render tenure determinations prior to a faculty member's fifth year of service; and the procedures for reappointment and termination set forth in the faculty manual. Thus in essence he claims that the rules and understandings promulgated and fostered by the university gave rise to a property interest in continued employment subject to procedural due process.

Since 1971 tenure has not been awarded to any faculty member in the sociology department until his fifth year of service. As found above, in only one instance was a tenure decision made in a faculty member's fourth year; in plaintiff's case, however, it is clear that a retention, and not a tenure, decision was made. Similarly since 1971 no faculty member employed on a continuing basis, other than plaintiff, has been terminated prior to his fifth year in the department. In view of all the circumstances herein, however, these facts alone are clearly insufficient to give rise to an objective expectation of entitlement to a full five year probationary period. At most they could reasonably support only a mere unilateral or subjective expectation of continued probationary employment.

■ Further, assuming without deciding that plaintiff had a contractual right to all the procedures for retention and termination delineated in the faculty manual, such did not create a legitimate expectation of future employment until terminated in accordance therewith. The university's voluntary provision of guidelines for retention decisions and of certain procedures upon termination of a non-tenured faculty member does not give rise to a constitutionally protected property interest which does not otherwise exist; such is a matter of state law. See *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Ryan v. Aurora City Board of Education,* 540 F.2d 222 (6th Cir. 1976); *Lake Michigan College*

*Federation of Teachers v. Lake Michigan Community College,* 518 F.2d 1091 (6th Cir. 1975). In other words, the grant of specific procedural rights to a non-tenured faculty member in the context of a formal tenure system is not sufficient to invoke the guarantees of due process under the Fourteenth Amendment.

Therefore, under the totality of the circumstances presented, the Court must conclude that plaintiff had no reasonable expectation of continued non-tenured employment for a full five year probationary period. Thus plaintiff was not deprived of any property interest within the meaning of the Fourteenth Amendment by his termination.

■ Although plaintiff did not have a property interest in continued employment, he could not be terminated for exercising a specific constitutional right. *Perry v. Sindermann, supra.* Plaintiff claims that the decision to award him a terminal contract was made by reason of his exercise of his right to free speech as guaranteed by the First Amendment. Specifically, he contends that said decision was motivated by his teaching from a Marxist perspective and by the expression of his views regarding student rights. Both of these activities assertedly constitute constitutionally protected conduct.

■ It is well established that a discharged faculty member may establish a claim to reinstatement if the termination decision was predicated upon the exercise of constitutionally protected First Amendment freedoms. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In order to establish such claim of entitlement, plaintiff initially bears the burden of showing that his conduct was constitutionally protected, and that such conduct was a substantial or motivating factor in the decision to terminate his employment. *Id.* at 287, 97 S.Ct. 568. It need not be the sole or primary reason for said decision, however. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Plaintiff having made the requisite showing, the burden of proof shifts to the defendant to establish by a preponderance of the evidence that the same decision respecting plaintiff's employment would have been reached even in the absence of the protected conduct. *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. 568.

In this action, plaintiff claims that his termination was significantly motivated by his activity in the classroom and on behalf of graduate students, and that such amounted to constitutionally protected conduct. As previously found, however, such activity was not a consideration or motivating factor in the decision to terminate plaintiff's employment. Rather, the sole basis for said decision was plaintiff's publication record. Thus the Court must conclude that plaintiff has failed to satisfy his burden of sufficiently showing that the decision to award him a terminal contract was motivated by constitutionally impermissible factors.

■ Alternatively, even if plaintiff is considered to have met his initial burden of proof, the Court finds defendants have shown, by a preponderance of the evidence, that they would have made the same determination regarding plaintiff's employment even absent the protected conduct. Upon review of the entire record herein, it cannot be said that the reason given for defendants' decision, namely plaintiff's publication record, is pretextual. Rather, the judgment of the tenured faculty members in the sociology department as to the sufficiency of plaintiff's publication record appears to be amply supported and reasonable under the circumstances presented. In reaching such conclusion the Court has not attempted a de novo evaluation thereof, but has merely sought to discover whether there is support for defendants' determination. Indeed the Court recognizes that:

> The weight to be given scholarly writings and their publication in a tenure decision involves judgmental evaluation by those who live in the academic world and who are charged with responsibility of decision. Scholarship and research have been

described as 'the indispensable tools of the scholar's trade,' and as such they should be left to scholars. Absent a showing of discrimination or other violation of constitutional or statutory rights, the court is guided by the words of Judge Moore: 'Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision.' [Footnotes omitted].

*Labat v. Board of Higher Education of City of New York*, 401 F.Supp. 753, 757 (S.D.N. Y.1975).

In view of the foregoing, the Court must conclude that plaintiff has failed to establish a meritorious claim under the First Amendment.

■ Finally, plaintiff claims under state law a breach of the terms of his employment contract. Although plaintiff's federal claims have been found to be insubstantial, the Court, in the interests of justice and judicial economy, shall exercise pendant jurisdiction over his state law claim.

Essentially, plaintiff contends that his employment contract with the university expressly incorporated by reference the regulations of the board of trustees and the faculty manual. He thus argues that he was entitled to the procedures provided in division B, section 16 of the faculty manual, entitled "Guidelines for Promotion, Tenure, Retention and Initial Appointment." Plaintiff specifically alleges that such provisions were mandatory, and that defendants failed to follow or violated subsections 2(b), (e) and (h) thereof thereby breaching his employment contract.

■ In their trial brief, defendants have affirmatively stated that each of plaintiff's employment contracts with the university incorporated the faculty manual. The parties thus being in agreement, the Court shall adhere to the proposition that the university's rules and regulations as set forth in the faculty manual are a part of the employment contract between the university and plaintiff. See *Rehor v. Case West-*

*ern Reserve University*, 43 Ohio St.2d 224, 331 N.E.2d 416 (1975).

■ Although division B, section 16 of the faculty manual was therefore a part of plaintiff's employment contract, the Court finds that the procedures set forth therein are not mandatory. This finding is predicated upon a number of factors including the language of the section. First, the initial sentence introducing section 16 merely provides that "[t]his statement was adopted by University Council on April 26, 1973 as follows," and does not specify that these procedures are to be followed as was done in section 15 of division B. Second, the indiscriminate use of "should," "will," and "shall" throughout section 16 hardly evidences a clear intent to require strict adherence to each of its provisions. Further, the legislative history indicates that these guidelines are recommendations for adoption by each department according to its particular situation. In other words, although the various departments, divisions or colleges of the university should have procedures for promotion, tenure and retention, each of the procedures suggested in section 16 need not be implemented.

■ In the alternative, even if the procedures of section 16 are mandatory, the Court finds that defendants have substantially complied therewith. Initially, it is clear that the tenure committee of the sociology department considered retention matters first and separate from tenure decisions. The evidence also indicates that the standard of performance required for retention was significantly less than that required for tenure. Additionally, it is clear that in November 1976 the committee evaluated plaintiff for purposes of retention and made a non-reappointment decision as to him. Thus to the extent subsection 2(b) of section 16 requires separate procedures on tenure and promotion, the sociology department followed such, and plaintiff has not shown what procedures should have been followed that were not. Further with regard to the part of subsection 2(b) dealing with appropriate committees for retention and tenure, subsection 2(i) provides for the composition thereof to be all tenured faculty members. Therefore, defendants cannot

be found to have violated subsection 2(b) since it is clear that the same individuals are to make both tenure and retention determinations.

With regard to subsection 2(e), defendants did request that plaintiff submit a vita and any other data for purposes of evaluating his performance. Although plaintiff was not invited to appear before the tenure committee in November 1976, he did submit a statement to the tenure appeals committee in January 1977, and appeared before the retention recommendations committee in February 1977, which as found above made a de novo review of plaintiff as of that time.

Section 2(h) states that the criteria for retention, tenure and promotion need clear definition. The Court has previously found that since 1971 the sociology department has had a document defining the criteria for tenure and promotion. Additionally, during his first year plaintiff was made aware of the criteria used for evaluating one's performance on at least three occasions. He also has admitted that he knew scholarly research and publication was important to a doctoral department and was one of the criteria by which he was to be judged. Moreover, the October 1975 warning letter sent to plaintiff by the tenure committee specifically noted the criteria considered in reviewing plaintiff: publications, departmental and college activities, and teaching. Thus the Court cannot conclude that plaintiff did not have adequate notice of the criteria by which he was evaluated. Nor can the Court conclude that such were not clearly defined. Each of the three standards involved constitutes a definite criteria; it would be unreasonable and impractical to require that all possible factors to be considered and weighed in applying them be delineated since evaluation of academic performance is highly judgmental and subjective. See *Fluker v. Alabama State Board of Education*, 441 F.2d 201 (5th Cir. 1971); *Equal Employment Opportunity Commission v. Tufts Institution of Learning*, 421 F.Supp. 152 (D.Mass.1975); *Green v. Board of Regents of Texas Tech University*, 335 F.Supp. 249 (N.D.Tex.1971), aff'd, 474 F.2d 594 (5th Cir. 1973).

Furthermore, even if the procedures of section 16 be considered mandatory, and the procedures of the sociology department in November 1976 be considered insufficient, plaintiff was granted all the procedures outlined in section 16 beginning in February 1977. As found above, the department adopted separate retention guidelines and procedures in accordance with said section, and fully complied therewith as to plaintiff. Indeed, any initial violations of the faculty manual amounting to insufficient performance of the employment contract by defendants were corrected and in any event were de minimis.

Therefore, the Court must conclude that defendants have not breached the terms of plaintiff's employment contract with the university.

Based on the foregoing, the Court finds that the termination of plaintiff's employment with the University of Akron was neither in violation of either the First or Fourteenth Amendments to the United States Constitution, nor a breach of his employment contract under state law. Thus he is not entitled to any relief in this action.

Accordingly, judgment shall be entered for defendants and against plaintiff.

IT IS SO ORDERED.