Submitted on record and briefs October 29, affirmed December 15, 1975, reconsideration denied January 21, petition for review denied February 24, 1976

NANCE, *Petitioner, v.* OREGON STATE SYSTEM OF HIGHER EDUCATION ET AL (CA 3637), *Respondents.*

543 P2d 687

John B. Nance, Monmouth, filed the briefs pro se.

Lee Johnson, Attorney General, W. Michael Gil-

lette, Solicitor General, and Catherine Allan, Assistant Attorney General, Salem, filed the brief for respondents.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

## SCHWAB, C. J.

Petitioner appeals from a decision of the State Board of Higher Education, made by its subordinates, affirming the nonrenewal of his annual appointment to the faculty at the Oregon College of Education.

■ Petitioner elected to represent himself in the administrative hearing that generated a 558-page transcript. Petitioner elected to represent himself on this appeal, filing an 89-page brief and a 47-page reply brief. This is petitioner's unquestioned right. But the exercise of such right imposes certain responsibilities, such as, (1) compliance with procedural rules designed to insure fairness to all litigants, and (2) clear communication of his contentions.

As for procedural compliance, petitioner acknowledged during the administrative hearing that he understood that to be his only opportunity to introduce evidence on his factual contentions. Nevertheless, on appeal petitioner has deviated from the hearing record by citing newspaper articles, minutes of State Board meetings, proceedings at the University of Oregon, proceedings before the Public Employe Relations Board, collective bargaining agreements between the Board and the faculties at other campuses and the "PPP Report," whatever that is.[1]

---

[1] Petitioner's opening brief makes "assignments of error in law" and separate "assignments of error in equity." It is not clear what he perceives to be the distinction between law and equity. This is not an equitable proceeding.

As for communication, petitioner's argument starts: "This is a proceeding in academic due process." His argument continues with numerous references to: "the issue of academic freedom"; "the end of the tenure system"; "the health of the [teaching] profession"; "medieval university structures"; and the "balance of power" between the administration and faculty. We doubt that these issues are generally justiciable. To the extent that they might be, we are not confident that we have been able to deduce petitioner's exact contentions.

As we understand the record, petitioner received a series of three, one-year appointments to the OCE faculty. These were "yearly tenure" appointments; they provided that petitioner could not be discharged during the year except for cause, but did not guarantee that petitioner's employment would necessarily be renewed for following years. *See generally, Papadopoulos v. Bd. of Higher Ed.,* 14 Or App 130, 511 P2d 854, Sup Ct *review denied* (1973), *cert denied* 417 US 919 (1974).

After three years' employment, petitioner was entitled to one year's notification that his employment would not be renewed. At the end of petitioner's third year, college officials notified him that his fourth year would be his last.

Petitioner strenuously objected to that determination. A series of informal efforts to mediate the dispute between petitioner and the college, similar to the informal procedures described in *Papadopoulos,* 14 Or App at 139-151, proved inconclusive. The Board, through counsel, then agreed to afford petitioner a formal contested case hearing pursuant to the Administrative Procedures Act, ORS ch 183.

The formal hearing was conducted before a sub-

committee of the Faculty Welfare Committee of the OCE Faculty Senate. The committee's recommendations were generally favorable to petitioner. On review the college president's findings and conclusions were all adverse to petitioner, the ultimate conclusion being that "[t]he termination of Dr. John B. Nance as a faculty member of Oregon College of Education * * * is hereby affirmed * * *." It is from this determination that petitioner appeals.

█ Petitioner belabors the claim that he had a protected property interest and a protected liberty interest within the meaning of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Petitioner seems to recognize the general rule to be that a public employe with "yearly tenure" has no legitimate expectation of continued employment beyond that year. *Papadopoulos v. Bd. of Higher Ed.*, supra. But in an apparent effort to invoke an exception to the general rule, petitioner variously argues he had a property right: "to an evaluation"; to "an explanation" of the reasons his contract was not renewed; to "the use of the APA"; based upon established tenure "criteria and procedures"; and based upon the generally favorable "Findings and Recommendations of the * * * Hearing Committee."

█ It is not clear that petitioner understands the body of law he invokes. The Due Process Clause does not prohibit the government from depriving citizens of liberty or property. That happens every day in cases ranging from criminal to condemnation. All the Due Process Clause requires is that, in circumstances such as these, government action be preceded by allowing the affected citizen an opportunity to be heard. Petitioner does not contend that he had other than a full and fair opportunity to be heard during the contested case hearing. Therefore, the possible

existence and extent of his alleged property interests are now irrelevant.[2]

Even though irrelevant, one of petitioner's "property interest" arguments so completely misses the mark that it merits additional comment. Petitioner claims he had "an affirmative tenure evaluation" from the other faculty members in his division. He then cites one of the Board's rules: "indefinite tenure *shall be awarded to faculty of demonstrated profes-sional competence by the institutional executive* * * *." Based on the "affirmative tenure evaluation" and the regulation, petitioner concludes he had a "right" to tenure.

We are not sure what part of the record is supposed to constitute the "affirmative tenure evaluation." There are some evaluations of petitioner by his faculty colleagues. They were written in response to the following memorandum:

"As most of you know, the possibility of [petitioner] receiving a year's notice of termination has been discussed within the division informally as well as at the last divisional meeting. The consensus seems to be that our role should be limited to providing an evaluation of [petitioner's] contribution to our program * * * for consideration by the department chairman * * *."

In response to this memorandum, petitioner's colleagues generally recommended his retention. They did not express opinions on a question they were not asked—whether petitioner should be granted tenure.

■ But assuming for the sake of discussion that petitioner received a favorable tenure recommendation from his immediate peers on the faculty, this does not

[2] We do not here hold that petitioner was entitled to a contested case hearing on the reasons for the nonrenewal of his annual appointment. That decision was made by the State Board, through counsel, not by us.

create any "right" to tenure. Under the statutory scheme, ORS 351.070(1)(a), personnel decisions are made by the State Board and its subordinate officials —in other words, the administration. Petitioner misreads the Board's rule when he concludes that tenure must be granted to faculty members who demonstrate professional competence to their colleagues or students. Instead, it contemplates demonstrating professional competence to those who make the ultimate decision—the administrators.

Petitioner next contends the conclusions of the formal hearing committee constituted a final decision that was not subject to modification by the college president. His reasoning in support of this contention is unclear.

■ If petitioner means that as a matter of general administrative law, the record-making body is always the same as the decision-making body, he is incorrect. It is a familiar administrative practice to separate record-making functions, such as before a hearing officer, and the subsequent final decision by the agency. We find nothing in the State Board's rule contrary to this customary practice.

■ If petitioner means that in his individual case there was a delegation of authority to make a final determination to the hearing committee, he is also incorrect. We find nothing in the record or regulations to support a finding of such delegation of authority. The discussion above rejecting the claim of delegation of final authority to petitioner's faculty colleagues is equally applicable to the claim of delegation of final authority to the faculty hearing committee. Moreover, we note that during the course of the hearing nobody seemed to think the committee was making the final decision; at one point, petitioner referred to the committee's forthcoming "recommen-

dation"; and in fact, the committee phrased its conclusion as a "recommendation."

■ Petitioner's final effort to establish that the committee's decision was final invokes the public employes' collective bargaining law, ORS ch 243. Petitioner argues:

"The State Board * * * recognizes the OCE Faculty Senate as a collective bargaining agent pursuant to ORS 243.666(3). The Board has an agreement with the OCE Faculty Senate concerning employment rights, contracts and grievance procedures."

Building on this foundation, petitioner's argument continues that the hearing afforded him was actually binding arbitration in accordance with ORS 243.706 (2), and concludes that the State Board is committing an unfair labor practice by not honoring the "arbitration" decision.[9]

The short answer is that petitioner's premises, quoted above, are based on factual matters that are not even remotely contained in the administrative record before us. There is not the slightest suggestion whether the Board has or has not recognized the Faculty Senate as a collective bargaining agent. Indeed, going beyond the record petitioner tells us that the

---

[9] The labor relations statutes upon which petitioner relies provide:

"Nothing in this section prevents a public employer from recognizing a labor organization which represents at least a majority of employes as the exclusive representative of the employes of a public employer when the board has not designated the appropriate bargaining unit or when the board has not certified an exclusive representative in accordance with ORS 243.686." ORS 243.666(3).

"In addition to subsection (1) of this section, a public employer may enter into a written agreement with the exclusive representative of its employes providing that a labor dispute over conditions and terms of a contract may be resolved through binding arbitration." ORS 243.706(2).

"OCE faculty has attempted to gain PERB certification since February, 1973," which has been opposed by the Board. The claim that the Board opposes certification, if true, certainly seems inconsistent with petitioner's major premise that the Board has already recognized the Faculty Senate as a collective bargaining agent.

■ Petitioner's other premise—that the Board has agreements with the Faculty Senate concerning employment rights—also fails. In the context of labor law, agreements means negotiated agreements. Petitioner cites no negotiated agreements. Instead, he cites a variety of Board rules that permit and encourage faculty consultation and participation in making personnel decisions. By no stretch of the imagination can these rules be viewed as negotiated agreements. Moreover, nothing in the rules petitioner cites could conceivably amount to a binding arbitration procedure.

■ As yet another, and seemingly alternative, argument, petitioner suggests that even if the hearing committee's determination was subject to review, such review had to be by other than the college president because of his prior contacts with the nonrenewal issue. But prior contracts do not per se establish lack of impartiality. *Withrow v. Larkin,* 421 US 35, 95 S Ct 1456, 43 L Ed 2d 712 (1975). And there is no other comprehensible claim the president lacked the requisite impartiality.

Two factual questions were litigated before the hearing committee: (1) the adequacy of the notice petitioner received; and (2) the reasons behind the administrative decision that his annual appointment would not be renewed.

There is no claim that notification of nonrenewal

was not timely. The issue is its adequacy. The notification reads:

> "The purpose of this letter is to inform you that OCE cannot presently assure you of employment beyond the 1973-74 academic year. It is necessary that this notice be sent to you before June 15, 1973, because of State System administrative rules. These rules require that a non-tenured faculty member be given a full years notice if he cannot be employed beyond that period.
>
> "I believe that Don Duncan and Bert Kersh have explained to you that declining and shifting enrollments have necessitated this decision. You are regarded here as a creative individual, especially in the art of film making. Several students have gone out of their way to inform me of their appreciation for you as a person and a lecturer. I regret that the budget limitations thrust upon us by sharply declining enrollment force a decision like this one upon us."

The hearing committee concluded that petitioner "was not given a clear and unambiguous letter of termination." On review, the college president concluded:

> "There was no ambiguity in the notice given to Dr. Nance. He was informed orally of the decision prior to receiving a letter from the president on June 7, 1973. In numerous subsequent conversations with the dean of faculty and with the president he expressed no confusion about intent of the notice he had received but rather concentrated upon getting the decision reversed."

 There is ample evidence to support the president's decision. At one point a member of the hearing committee asked petitioner, "What did you understand this letter to mean?" Petitioner replied, "It definitely meant that I was receiving a year's notice and that the basis of the notice was enrollment declines." At an-

other point the college president testified that faculty members always receive advance oral notification so that a letter "never catches anybody cold." Petitioner agreed the letter did not "catch him cold":

"Yes, because I had in fact a meeting with Don Duncan on May the 22nd in which he handed me this and asked me to sign it. It notified me right down here I was not going to be retained on the staff. That one surprised me, but your letter didn't since I had some forewarning."

Under these circumstances, the notice was sufficient to communicate to a reasonable person in petitioner's position that his employment would not be renewed.[2] *See, Perrin v. Ore. St. Bd. Higher Ed.,* 15 Or App 268, 274, 515 P2d 409 (1973), Sup Ct *review denied, cert denied* 417 US 950 (1974).

■ There is some confusion in the record about the reasons behind petitioner's nonrenewal. Much of the evidence suggests the reason was college-wide declining enrollment that necessitated a reduction in staff. Yet other evidence indicates that, although the administration was generally satisfied with petitioner's performance, they thought they could replace him with somebody even better; this seems inconsistent with a staff-reduction rationale. Another inconsistency arises from evidence that other teachers were being hired just before the decision not to renew petitioner's employment; if declining enrollment necessitated a staff reduction, it seems reasonable to expect that new teachers would not have been hired in those areas slated for reduction.

---

[2] Petitioner claims that the college president's determination was based on evidence outside of the hearing record. This contention appears to be technically correct, in that the president's decision recited certain background facts that never came out during the hearing. But petitioner does not indicate any way in which this technical error might have been prejudicial; hence, it is no basis for reversal. ORS 183.480(7)(a).

There was conflicting evidence about petitioner's specialization. He was teaching both media and psychology courses. The administration perceived petitioner as primarily a media professor, and determined media was one area where staff should be reduced. Petitioner presented evidence that he was primarily a psychology professor, an area where there was apparently no reduction in staff.

But the fact remains that at the end of each yearly appointment, assuming proper notice, the school administration could choose not to renew petitioner's employment for any reason or no reason, other than a few constitutionally impermissible reasons, such as race, not claimed to be involved here. *Schlichting v. Bergstrom,* 13 Or App 562, 511 P2d 846 (1973). Even if petitioner unequivocally established all that he claims, i.e., that he was primarily a psychology professor and the administration's contrary perception was a serious error or that staff reduction was not the real reason for his nonrenewal, this would be no basis for setting aside the administration's determination.

Petitioner will probably fault us for not considering numerous other issues he will claim he has raised. There might, indeed, be other issues lurking in this case, since, for example, petitioner's briefs are peppered with citations to various provisions of the federal and state constitutions. But what we have said above disposes of all issues that we both understand and believe warrant published comment.

Affirmed.