James E. PIACITELLI, Plaintiff, Appellant, and Cross-Respondent,

v.

SOUTHERN UTAH STATE COLLEGE; and Orville D. Carnahan, President, Southern Utah State College, Defendants, Respondents, and Cross-Appellants.

No. 17202.

Supreme Court of Utah.

Sept. 18, 1981.

H. Delbert Welker, Salt Lake City, for appellant.

Robert L. Gardner, Cedar City, for respondent.

OAKS, Justice:

This is an action by a college employee who claims he was terminated without the formal termination procedures required by his contract. The district court denied reinstatement but awarded back pay for a period of approximately six months. The employee appeals the failure to reinstate him, and the College cross-appeals the award of back pay. We affirm on both issues.

In 1973, plaintiff Piacitelli commenced employment as Coordinator of Counseling at Southern Utah State College (SUSC) (hereinafter "the College"). In this position, which was categorized as nonfaculty "classified staff," he was not eligible for tenure like faculty members at the College. In each of the academic years beginning 1973 through 1978, Piacitelli was issued a "Notice of Appointment," signed by the President of the College and effective "for the contract period" of July 1 through June 30. This document specified Piacitelli's job title, department, and salary for the year. For each of those years, Piacitelli signed and returned a form indicating his acceptance of employment for the duration and compensation specified.

Beginning early in his employment, a number of conflicts and disagreements arose between Piacitelli and his supervisors, the Dean and Associate Dean of Students. Some of these problems were resolved; others were not. In December, 1978, Piacitelli's immediate supervisor recommended that the College not continue to employ Piacitelli as a counselor. In a one-sentence letter dated January 24, 1979, the College President informed Piacitelli that his contract would "not be renewed at the end of the current contract period." In a letter dated February 13, 1979, the President advised Piacitelli that the College's action was "not to be interpreted as 'dismissal for cause,' which action, if taken, would result in immediate termination of employment ..." The Dean of Students later explained in an affidavit that the administration preferred nonrenewal to dismissal for cause "out of consideration for his professional future and in accordance with higher education practices ..."

### I. THE INITIAL PROCEEDING

Piacitelli commenced his initial action on April 17, 1979, charging that a failure to renew his employment contract was, in effect, a dismissal for cause and as such violated his "due process rights as set forth in the SUSC Personnel Policies and Procedures." Piacitelli asked for declaratory relief, reinstatement, costs and attorney's fees, and "such other and further relief as the court deems proper."

In the district court, Piacitelli relied on the College's Personnel Policies and Procedures Manual (hereinafter "Personnel Manual"), Section II–14 of which sets forth formal procedures to be followed in the "dismissal" of a classified employee who has completed a six-month probationary period. Several passages in the Personnel Manual seem to suggest that all employees are either probationary (terminable at will) or permanent (terminable only after compliance with specified procedures). Consequently, Piacitelli argued, by not renewing a "permanent" employee's contract the College was attempting to circumvent its own procedures and accomplish indirectly what its Personnel Manual prevented it from accomplishing directly.

The College conceded that Piacitelli was a classified employee and that he was not probationary. However, it contended that Piacitelli was employed on a year-to-year basis; that his contract expired by its own terms in June, 1979; and that he was not dismissed at all, but simply not rehired. Therefore, the College concluded, its formal termination procedures did not apply. Those procedures would have applied, according to the College, only if Piacitelli had been dismissed before the expiration of the annual contract period. The College further argued that to equate nonrenewal with dismissal would, in effect, grant tenure sta-

tus to all nonprobationary classified staff employees, an anomolous result in light of the fact that this status is not conferred on all of the faculty.[1]

In January, 1980, the district court ruled that the College's Personnel Manual governed the terms of Piacitelli's employment contract with the College, that Piacitelli had acquired "permanent employment status" under that contract, and that the College's failure to renew Piacitelli's annual employment contract without complying "with due process of law requirements pursuant to [the Personnel Manual] . . . constituted plaintiff's termination and thus a breach of contract." The district court thereupon ordered the College to grant Piacitelli "administrative due process procedure pursuant to the [Personnel Manual]."

This was a final order, which, unless reversed on appeal, is *res judicata* and binding upon these parties. *Bradshaw v. Kershaw*, Utah, 627 P.2d 528 (1981); *Federated Department Stores, Inc. v. Moitie*, —— U.S. ——, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). The order was not appealed. Consequently, for purposes of this case, we must treat Piacitelli as an employee with permanent employment status whose employment contract entitled him to the formal procedures specified in the Personnel Manual before he could be dismissed or terminated, even at the conclusion of the annual contract period.[2]

## II. THE DISMISSAL AND SUBSEQUENT PROCEEDING

On February 8, 1980, the College Personnel Director issued a formal notice of dismissal to Piacitelli and advised him of his right to appeal. Piacitelli pursued his appeal through three college appellate authorities,[3] all of which upheld the dismissal.

Piacitelli then took the controversy back to the district court, which on June 2, 1980, issued an order to show cause why the College should not be held in contempt of court or reinstate Piacitelli to his former position and pay him back wages. After a hearing on this order, the district court ruled that the College had substantially complied with its procedures, that Piacitelli was rightfully terminated as of February 8, 1980, that there were no grounds for ordering the College to reinstate him, and that he was entitled to back pay for the period July 1, 1979, through February 8, 1980.

## III. REINSTATEMENT FOR NONCOMPLIANCE WITH PERSONNEL MANUAL

Piacitelli's sole argument on appeal is that the district court should have ordered him reinstated because, contrary to the court's conclusion, the College had not adequately complied with the contractual termination procedures contained in its Personnel Manual.[4] This argument is based entirely on sections of the Personnel Manual that provide for "progressive discipline," the imposition of increasingly severe sanctions before dismissal. Section II–14 of the Manual outlines four steps of progressive discipline: (1) oral warning, (2) written

1. For the reasons stated hereafter, this question is not before us in this case and we express no opinion on it.

2. We intimate no agreement or disagreement with the district court's construction of Piacitelli's employment status or with its conclusion on the rights of classified College employees receiving annual notices of appointment. The fact that the question is *res judicata* settles those questions for these litigants and this case only.

3. The first appeal was to the Employee Dismissal Review Committee, a group consisting of six College employees, which held a one and one-half day hearing at which Piacitelli was represented by a representative of the Utah Public Employees Association. The Committee recommended to the College's President that the dismissal be sustained. Piacitelli appealed this decision to the President, who sustained the Committee's decision. Piacitelli then appealed to the Institutional Council, which undertook a full-dress review of the hearing. The Institutional Council, with nine of ten members present, unanimously upheld the President's decision and the recommendation of the Dismissal Review Committee.

4. See generally, Duerr, "Annotation: Reinstatement as a Remedy in Cases Involving Termination of Tenured Faculty," 7 J. of Coll. & U.L. 57 (1981).

warning, (3) suspension, and (4) dismissal. We need not decide whether the College was obligated to follow the progressive discipline requirements of the Personnel Manual on the facts of this case because we agree with the district court's finding that the College's actions constituted substantial compliance with those requirements in any event.

■ We underline at the outset the district court's finding, which is now binding in this case, that the terms of Piacitelli's employment were governed by the College's Personnel Manual. This finding comports with the numerous holdings that an educational institution may undertake a contractual obligation to observe particular termination formalities by adopting procedures or by promulgating rules and regulations governing the employment relationship. *Greene v. Howard University*, 412 F.2d 1128 (D.C.Cir.1969); *Decker v. Worcester Junior College*, 369 Mass. 960, 336 N.E.2d 909 (1975); *Hillis v. Meister*, 82 N.M. 474, 483 P.2d 1314 (1971); *Zimmerman v. Minot State College*, N.D., 198 N.W.2d 108 (1972).[5] We are, therefore, construing a contract, not declaring statutory or constitutional rights.

The College's Personnel Manual states that "generally there is a required corrective action," which the manual refers to as "progressive discipline," which "may result in dismissal or suspension unless there is a major, serious, or aggravated act of misconduct which requires immediate action." Personnel Manual, II–14, p. 2. The Manual also provides that progressive discipline should be "corrective whenever possible, rather than punitive," should concentrate on "preventing serious personnel problems from occurring," and "should never involve the element of surprise to the employee." *Id.* at pp. 2 and 5. The Manual also states that "[t]he 'progressive discipline' process used in appropriate circumstances is a follow-through method to ensure that infractions, misconduct, or unacceptable performance is treated in a manner that will eliminate, correct, or resolve such actions or practices, if possible." *Id.* at p. 5. It is clear from these statements that the purpose of the progressive discipline approach is to prevent major acts of misconduct by giving the employee an early warning of the possible consequences of his persisting in unacceptable behavior.

■ Circuit Judge Owens, sitting by designation after the initial proceeding in the district court, ruled that substantial compliance with the procedural requirements of the Personnel Manual was sufficient so long as it answered the purpose of those requirements:

> If the purpose [of progressive discipline] was attained through other means than by strict adherence to the letter of the manual, then this should not be deemed a breach of the contract.

We agree. Because the purpose of the procedural requirements was fulfilled and the substantial interests of the parties were satisfied, we see no merit in requiring strict or literal compliance with the prescribed procedures in this case. This employment contract between a college and a counselor formalized a relationship of mutual trust

---

**5.** The existence of such a contractual obligation does not preclude an employer's changing current procedures and regulations according to existing practices and procedures for amendment. Thus, it has been held that an employer's policy manual may give rise to employee contractual rights even where it "can be unilaterally amended by the employer without notice to the employee . . . ." *Toussaint v. Blue Cross and Blue Shield*, 408 Mich. 579, 615, 292 N.W.2d 880, 892 (1980) (non-educational employer). See also, *Knowles v. Unity College*, Me., 429 A.2d 220 (1981).

In the absence of a contractually based obligation for continued employment or mandatory termination procedures, many courts have held that an educational institution may, with proper notice, choose not to renew a nontenured employee's contract for no reason or for any reason other than a few constitutionally impermissible ones. *Hickingbottom v. Easley*, 494 F.Supp. 980 (E.D.Ark.1980); *Cooper v. Ross*, 472 F.Supp. 802 (E.D.Ark.1979); *Kota v. Little*, 351 F.Supp. 1059 (E.D.N.C.1971), aff'd 473 F.2d 1 (1973); *Nance v. Oregon State System of Higher Ed.*, 23 Or.App. 558, 543 P.2d 687 (1975), cert. denied 429 U.S. 827, 97 S.Ct. 84, 50 L.Ed.2d 90 (1976). See also, *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

and confidence, not an adversary relationship or an impersonal commercial contract. In this context, contract compliance on both sides should be measured by the substance of the relationship, not by its technical details. While exact conformance with the precise terms of the termination procedures is doubtless the least controversial course, so long as the substantial interests those procedures are designed to safeguard are in fact satisfied and protected, failure to conform to every technical detail of the termination procedure is not actionable. *Carr v. Board of Trustees*, 465 F.Supp. 886 (N.D. Ohio 1979) (alternative ground).

Was the substantial purpose of the requirement of progressive discipline fulfilled in the circumstances of this case? The district court found as follows:

> A review of affidavits on both sides discloses quite clearly that (1) Plaintiff was advised, directly or by inference, of his unacceptable conduct repeatedly over a period of years, and (2) that he resisted conforming. This Court further finds that this history substantially fulfilled the corrective purposes of the Personnel Manual, and was the effective equivalent of the oral warning-written warning-suspension-dismissal procedure set forth in Section D of the Manual.

■ On appeal, this Court must consider all evidence in the light most favorable to the trial court's findings of fact. Those findings are entitled to a presumption of correctness and may not be overturned so long as they are supported by substantial evidence in the record. *R. C. Tolman Construction Co. v. Myton Water Ass'n*, Utah, 563 P.2d 780 (1977); *Child v. Hayward*, 16 Utah 2d 351, 400 P.2d 758 (1965); *Charlton v. Hackett*, 11 Utah 2d 389, 360 P.2d 176 (1961). After reviewing the affidavits and the other material in the record on appeal, we find substantial evidence to support the court's finding. Piacitelli's conflicts with the College were long standing. In his numerous interviews with his superiors, he was given ample notice that his job was in jeopardy because of specified deficiencies in his performance. We therefore sustain the district court's conclusion that the College substantially complied with the contract requirement of progressive discipline.

Piacitelli made no other challenge to the district court's conclusion that he was rightfully terminated as of February 8, 1980. The judgment denying him reinstatement is therefore affirmed.

## IV. LIABILITY FOR BACK PAY

The College cross-appeals the district court's ruling that Piacitelli should receive back pay for the period from June 30, 1979, when the College ceased to pay him, through February 8, 1980, when he was properly terminated.

■ For purposes of this cross-appeal, we must consider two questions settled. First, the nonrenewal of Piacitelli's contract on June 30, 1979, was procedurally defective because it was accomplished in violation of his contractual right to formal termination procedures. Second, the College had just cause to dismiss Piacitelli.[6] Consequently, the back pay issue may be framed as follows: Is a college employee who was dismissed with sufficient cause, but in violation of contractually guaranteed termination procedures, entitled as a matter of contract law to back pay for the period between the procedurally defective dismissal and the subsequent proper dismissal?[7] We hold in the affirmative, and affirm the district court on the cross-appeal.

---

6. The first question is settled by the principle of *res judicata*, discussed earlier. The second question is settled by the fact that Piacitelli's dismissal on February 8, 1980, which this Court has now sustained, was based entirely on conduct he had engaged in prior to receiving notice of nonrenewal. Thus, if Piacitelli had been accorded full termination procedures in January, 1979, he could and probably would have been terminated at that time.

7. This is not a case where the terms of the contract could be satisfied by a hearing *after* the dismissal. Compare the contract construed in *Lillie v. Commerce City Kindergarten, Inc.*, 29 Colo.App. 553, 487 P.2d 605 (1971).

■ Numerous state and federal courts have considered the propriety of back pay awards after justified but procedurally deficient dismissals. But, unlike the instant case, the appellate opinions in the decided cases have not rested primarily on contract theory. In all but one of those cases,[8] the employees' claims have been founded upon 42 U.S.C. § 1983, which provides a federal damage remedy against one who, under color of state law, deprives the plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws . . . ." The right claimed in those cases is the Fourteenth Amendment right not to be deprived of property without due process of law. The property at stake in each case is the plaintiff's contractual expectation of continued employment. In the § 1983 cases, the employment contract ordinarily appears only as a spoke in a larger constitutional and statutory wheel.

Back pay has normally been denied in these constitutionally based § 1983 cases on the rationale that the wrong suffered by the employee was not the dismissal. (Good cause being present, the employee would have been dismissed even if the required procedures had been followed.) The wrong was the deprivation of due process. Consequently, the plaintiff is not allowed to recover back pay, which is the normal remedy to compensate an employee dismissed *without* cause, but can recover only those damages directly traceable to the employer's failure to observe due process, viz., nominal damages and, in most cases, provable damages for mental and emotional distress. *Taliaferro v. Willett*, 588 F.2d 428 (4th Cir.

1978); *Burt v. Abel*, 585 F.2d 613 (4th Cir. 1978); *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569 (7th Cir. 1975), cert. denied 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); *Parks v. Goff*, 483 F.Supp. 502 (E.D.Ark.1980); *Ohland v. City of Montpelier*, 467 F.Supp. 324 (D.Vt. 1979).

The United States Supreme Court approved and applied this same measure of damages to the closely analogous case of the § 1983 damage claims of public school students suspended without the required due process procedures. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In doing so, the Court specifically rejected the reasoning of federal cases that had granted back pay to employees dismissed for cause but without due process.[9] Its opinion gave an extended explanation of the rationale of damages under § 1983. The Court characterized this statutory cause of action as a "species of tort liability." *Id.* at 253, 98 S.Ct. at 1047, quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Since tort damages are designed to compensate the plaintiff for an injury caused by the defendant, the Court approved the principle that "the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights . . . ." *Id.* at 254, 98 S.Ct. at 1047. This principle excluded "presumed damages" or damages for injuries caused by justified suspensions. Plaintiffs were limited to damages proved to have been caused by the denial of procedural due process.[10]

---

**8.** See *Nzomo v. Vermont State Colleges*, 138 Vt. 73, 411 A.2d 1366 (1980), a contract case which relies on the § 1983 precedents.

**9.** In cases the Supreme Court cited and disapproved, 435 U.S. at 260, n. 15, 98 S.Ct. at 1050, n. 15, Courts of Appeal in the Fourth and Fifth Circuits had granted back pay in § 1983 actions, reasoning that a termination without the legally required procedures was a nullity and consequently that the employee continued to be entitled to the benefits of the employment relation until he was dismissed with the proper formality. *Thomas v. Ward*, 529 F.2d 916 (4th Cir. 1975); *Zimmerer v. Spencer*, 485 F.2d 176

(5th Cir. 1973); *Horton v. Orange County Bd. of Ed.*, 464 F.2d 536 (4th Cir. 1972).

**10.** Other courts have applied this rationale in decisions based directly on the U. S. Constitution. These courts analogized to *Carey* or some other § 1983 case. *Kendall v. Bd. of Ed.*, 627 F.2d 1 (6th Cir. 1980); *Unified School Dist. No. 480 v. Epperson*, 551 F.2d 254 (10th Cir. 1977); *Bowler v. Bd. of Trustees*, 101 Idaho 537, 617 P.2d 841 (1980). But see *Wertz v. So. Cloud Unified School Dist. No. 344*, 218 Kan. 25, 542 P.2d 339 (1975), in which a contrary result was reached in a pre-*Carey* constitutional case.

The § 1983 authorities are not persuasive on the measure of damages that should be applied to a claim like Piacitelli's, which is based solely on a breach of the employment contract.

In the tort context, neither party has any underlying, continuing obligation to pay money to the other. Rather, the law seeks to compensate one party for an injury caused by a specific tortious act. The right to that compensation depends on a causal chain connecting defendant's wrongful act with plaintiff's injury. This approach dictates that an employee discharged with sufficient cause but in violation of his procedural due process rights is only entitled to the damages he can prove were caused by defendant's wrong. Since defendant's wrongful act was not the dismissal per se but the failure to observe due process, only damages flowing directly from the failure to observe the required procedures are recoverable.

This outcome contrasts with the outcome produced by analyzing the same problem from the standpoint of breach of contract. By entering into an employment contract of the type before us, the parties assume continuing obligations to one another: the employee to render services, the employer to pay salary. Those obligations continue until they are extinguished. Here, the termination mechanism described in the Personnel Manual, which the district court found to govern the terms of the contract between the College and its employee, was the sole means by which the College could extinguish the contractual relationship. Until it at least substantially complied with those procedures, its contractual obligation continued in force and the clock continued to run on Piacitelli's right to receive his contract salary.[11] Piacitelli is therefore entitled to recover that accrued salary, and is not limited to reimbursement for an injury caused by a specific wrongful act.

This result comports with what we deem to be sound policy for contractual employer-employee relations. It will encourage employers to comply promptly with their contractual termination procedures, and if they fail to do so will impose the monetary consequences on the party at fault. If the rule were otherwise, the employer could discharge an employee summarily and then omit or delay the contractual termination procedures with impunity so long as it was in possession of evidence which, when ultimately provided, would justify the discharge. In that circumstance, the employee, without notice of the reason for his dismissal and without any opportunity to refute the charges, would remain in an indefinite and painful state of limbo, uncertain about his ultimate right to reinstatement or back pay. If our rule works any hardship on employers, they can avoid it by prompt and substantial compliance with the procedures to which they have agreed.

The proper measure of damages for an employee who has been dismissed without substantial compliance with agreed termination procedures is the promised salary for the appropriate period, less amounts actually earned by the employee during that period or amounts he reasonably could have earned in other available employment of a like nature. *Pratt v. Board of Education*, Utah, 564 P.2d 294, 298 (1977); *Williston on Contracts*, Vol. 11, §§ 1358–1360 (3d ed. 1968); Annot., "Elements and Measure of Damages in Action by Schoolteacher for Wrongful Discharge," 22 A.L.R.3d 1047 (1968).[12] The employee is also entitled to interest at the statutory rate as specified in U.C.A., 1953, § 15–1–1. *Papadopoulos v. Oregon State Board of Higher Education*, 48 Or.App. 739, 617 P.2d 931 (1980). Mitigation of damages is an affirmative de-

---

11. An employee's right to compensation is of course subject to termination for failure to render his own agreed performance. That sort of failure is not at issue here since Piacitelli's performance was excused by the College's prevention. See *Fischer v. Johnson*, Utah, 525 P.2d 45 (1974).

12. It has also been held that the court may reduce a back pay award where the plaintiff teacher, after diligent search for other employment, pursued a doctoral degree at a university. *Boatright v. Bd. of Trustees*, 225 Kan. 327, 590 P.2d 1032 (1979).

fense, and any amounts in mitigation must be established by the employer. *Pratt v. Board of Education, supra.* Where no salary agreement has been reached for the damage period, the rate of pay for the previous salary year should be used as the base salary amount. *Brady v. Board of Trustees*, 196 Neb. 226, 242 N.W.2d 616 (1976).

In sum, we hold that, where the College breached its contract with this employee by originally discharging him without observing the formal termination procedures in the College Personnel Manual, (1) even though the College had good cause to dismiss the employee, it was under a contractual obligation to continue to pay his salary until he was properly dismissed; and (2) the College finally performed a proper dismissal by substantially complying with the procedures in its Personnel Manual and therefore is not obliged to reinstate the employee.

The judgment is affirmed. No costs awarded.

HALL, C. J., and STEWART and HOWE, JJ., concur.

MAUGHAN, J., heard the arguments, but died before the opinion was filed.