Sue CHERRY, Plaintiff and Appellant,

v.

UTAH STATE UNIVERSITY,
Defendant and Appellee.

No. 971625–CA.

Court of Appeals of Utah.

Oct. 8, 1998.

Stephen K. Christiansen, Donald L. Dalton, Van Cott Bagley Cornwall & McCarthy, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., Debra J. Moore, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before Judges BENCH, DAVIS, and WILKINS.

## OPINION

DAVIS, Presiding Judge:

Plaintiff Sue Cherry appeals from the trial court's orders granting summary judgment for defendant Utah State University (the University). We affirm.

## I. BACKGROUND

When reviewing the trial court's order granting a defendant's summary judgment motion, we state the facts in the light most favorable to plaintiff. *See Neiderhauser Builders & Dev. Corp. v. Campbell,* 824 P.2d 1193, 1194 (Utah Ct.App.1992). Defendant hired plaintiff to serve for one academic year as an assistant professor of dance beginning in September of 1992. Plaintiff's status was that of a tenure-eligible faculty member in the Department of Health, Physical Education and Recreation. The employment relationship between plaintiff and defendant was governed[1] by the University's Code of Policies and Procedures (the Code).

Two to three weeks into the 1992 fall quarter, Donna Gordon, director of the dance program at the University and the only other faculty member in the program, questioned plaintiff's technique, methodology, dance philosophy, teaching style, and ability. Gordon closely monitored and scrutinized plaintiff's actions by videotaping classes, conducting student ballots, and preparing written evaluations of plaintiff's classes. Gordon communicated her concerns to her department head, Robert Sorenson. In October, Sorenson told plaintiff that she would have to change the style of her classes immediately. Later, with Gordon present, Sorenson told plaintiff he was considering not renewing her contract.

In December, Sorenson appointed plaintiff's tenure advisory committee (TAC),[2] which included Gordon. Sorenson later showed plaintiff a letter he had prepared for interim Dean Izar Martinez, concluding that her contract should not be renewed in the coming year. Subsequently, plaintiff wrote Dean Martinez, urging that he involve her TAC in the evaluation of her job performance. Plaintiff's TAC issued its report in January 1993, anticipating renewal of plaintiff's contract. In February, Sorenson forwarded the TAC report to Dean Martinez, urging nonrenewal. Dean Martinez then forwarded Sorenson's letter to University President George Emert (the president). Martinez stated his concurrence with Sorenson's assessment that plaintiff's contract should not be renewed.

Later in February, the president informed plaintiff that her contract would not be renewed for the following academic year. The president's letter to plaintiff cited section 5–6 of the Code, which is pertinent to the nonrenewal of plaintiff's contract, and reads, in part:

> This *Code* does not require proceedings to terminate the employment of a non-tenured faculty member at the end of his contract period, by nonrenewal of his contract, except as hereinafter specified.

---

1. There is no mention in the record of any other contractual documents that are pertinent to this case.

2. According to the Code, "[f]or each new faculty member who is appointed without tenure, the faculty member's department chairman in consultation with the dean ... or comparable academic officer, shall appoint a Tenure Advisory Committee of at least five members, one of whom is from outside the department." The purpose of the TAC is to "review ... the candidate's qualifications for continuation on the staff and to report his progress toward the attainment of tenure." Utah State University Code § 5–6, pp. 9–10 (1974) (hereinafter USU Code).

... [I]f a non-tenured faculty member alleges that the nonrenewal of his contract is based upon discriminatory or prejudicial treatment in violation of his constitutional rights, or his academic freedom, he shall be accorded a hearing upon request. Upon receiving written notice of such an allegation from the faculty member concerned, the President ... shall arrange for a hearing before the [Academic Freedom and Tenure] Committee of the University, at which the faculty member shall have the burden of introducing competent evidence sufficient to support a decision that the nonrenewal was based on discriminatory, prejudicial facts and reasons. Review on appeal shall be limited to a determination of whether the President has met the non-prejudicial nondiscriminatory requirements.

USU Code § 5–6, pp. 18–19 (1974).

Under this section, plaintiff requested a hearing before the Academic Freedom and Tenure (AFT) committee and alleged that the nonrenewal decision was based upon prejudicial and discriminatory reasons in violation of her academic freedom.

The AFT committee convened a grievance subcommittee hearing and reviewed documentation provided by plaintiff and the president. On May 25, 1993, the AFT grievance subcommittee issued a written decision stating that Gordon's "comments and actions during the fall and winter of 1992–93 strongly suggest a campaign of undermining [plaintiff's] support among students." The concluding paragraph of the AFT grievance subcommittee's letter reads, "The committee is persuaded that Prof. Cherry's claims that [the University] has treated her with prejudice and discrimination, and has v[i]olated her academic freedom are clearly demonstrated. We *recommend* that you reconsider the decision for nonrenewal of Prof. Cherry's contract." (Emphasis added.)

On June 15, 1993, President Emert informed plaintiff that he had reconsidered the prior decision but was unable to agree with the AFT committee's recommendation, and further, that the University would not renew her contract.

Course of Court Proceedings

Plaintiff initiated this action in district court alleging breach of contract. First, plaintiff contended that her employment contract unambiguously vested the AFT committee with the ultimate decision of whether the president's determination violated the terms of her contract. Second, plaintiff asserted that her employment contract unambiguously vested her TAC with a role in the administrative renewal process. The University denied both allegations. Plaintiff then moved for partial summary judgment on her first ground. The University filed a cross-motion for summary judgment, contending that the president was not bound by the AFT committee's recommendations. The district court agreed and granted partial summary judgment to the University on that ground.

Plaintiff then filed a summary judgment motion on her second ground, contending that her employment contract unambiguously vested her TAC with a role in the administrative renewal process. The University again filed a cross-motion for summary judgment arguing that the TAC's evaluation was considered, but that its evaluation served only as a recommendation to the administration. Following a hearing on the matter, the district court again denied plaintiff's motion and granted the University's.

## II. ISSUES

On appeal, plaintiff first argues that the University's decision not to renew plaintiff's contract despite the AFT committee's determination violates the Code and thus her employment contract. Second, plaintiff asserts that the district court failed to properly interpret the section of the Code regarding the TAC's role in the annual review of nontenured faculty, providing an independent ground for reversal.

## III. STANDARD OF REVIEW

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a

matter of law." Utah R. Civ. P. 56(c). "In determining whether the trial court correctly found that there were no genuine issues of material fact, 'we view the facts and all reasonable inferences in a light most favorable to the party opposing the motion.'" *Builders*, 824 P.2d at 1196 (citation omitted). Because the trial court disposed of each of the issues before us on summary judgment, "[w]e review the trial court's conclusions of law for correctness, including its conclusion that there are no material fact issues." *Id.* (citation omitted).

## IV. ANALYSIS

The state system of higher education, including the University, is governed by Title 53B of the Utah Code. *See* Utah Code Ann. § 53B–1–102(1)(c) (1997). Under Title 53B, the president of each institution may "provide for the constitution, government, and organization of the faculty and administration, and enact implementing rules, including the establishment of a prescribed system of tenure." *Id.* § 53B–2–106(2)(b).[3] In addition, the president may "enact rules for administration and operation of the institution which are consistent with the prescribed role established by the board, or the laws of the state. The rules *may* provide for administrative, faculty, student, and joint committees with jurisdiction over specified institutional matters...." *Id.* § 53B–2–106(2)(d) (emphasis added). Title 53B's language regarding committees with jurisdiction is permissive. It neither requires the president to delegate authority to committees, nor precludes him from doing so.

### A. Whether Nonrenewal of Plaintiff's Contract Was in Violation of the Code

Although plaintiff focuses much of her argument on the issue of academic freedom, at the heart of this appeal is a question of contract construction and administrative authority. Plaintiff asserts that the AFT committee, pursuant to section 5–6 of the Code, has the authority to, in effect, overrule the

president's nonrenewal decision. Defendant argues that the AFT committee's role is advisory, and that the final decision regarding plaintiff's employment rests with the president.

### i. Academic Freedom

Plaintiff first argues that section 5–6 of the Code protects her as a nontenured professor by promising tenure-eligible professors "academic freedom." That the Code suggests tenure-eligible professors are entitled to academic freedom is not in dispute. Plaintiff's entitlement to academic freedom may, in fact, have been violated as determined by the AFT committee. If, however, the Code's provisions limit the AFT committee's authority to making recommendations that are advisory in nature, with the president of the University having the authority to disagree with the recommendations, then the determination of the AFT committee related to academic freedom is immaterial. Therefore, we must determine the scope of the committee's authority.

### ii. Construing the Contract

█ The parties to this appeal agree that the Code in effect during the 1992–93 academic year governs the rights and duties of both parties. "[A]n educational institution may undertake a contractual obligation to observe particular termination formalities by adopting procedures or by promulgating rules and regulations governing the employment relationship." *Piacitelli v. Southern Utah State College*, 636 P.2d 1063, 1066 (Utah 1981) (citations omitted). "We are, therefore, construing a contract, not declaring statutory or constitutional rights." *Id.*

█ Plaintiff contends that this court should strictly interpret the employment contract against the University. However, "in interpreting a contract, we first look to the four corners of the agreement to determine the intent of the parties." *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989). "If a contract is ambiguous, it will be construed against the

---

**3.** University employment decisions are expressly exempted from the provisions of the Utah Admin-

istrative Procedures Act (UAPA). *See* Utah Code Ann. § 63–46b–1(1)(d) (1997).

drafter only if extrinsic evidence fails to clarify the intent of the parties." *Trolley Square Assoc. v. Nielson,* 886 P.2d 61, 62–63 (Utah Ct.App.1994).[4] Although plaintiff and defendant have differing interpretations of the Code's language, both agree that the pertinent language is unambiguous.

### iii. The University's Grievance Process

■ Plaintiff maintains that the University breached her contract by overriding the Code's "appellate" procedures. "[T]he matter of plaintiff's procedural entitlement is ... controlled by [a]n examination of all the terms and conditions of plaintiff's employment." *Ofsevit v. Trustees of California State Univ. & Colleges,* 21 Cal.3d 763, 148 Cal.Rptr. 1, 582 P.2d 88, 92 (Cal.1978). In this case the controlling terms and conditions are found in the Code.

As stated above, section 5–6 of the Code controls the "appeals" process of a nontenured faculty member upon nonrenewal of the employment contract. Specifically, the language in question reads:

> [I]f a non-tenured faculty member alleges that the nonrenewal of his contract is based upon discriminatory or prejudicial treatment in violation of his ... academic freedom, he shall be accorded a hearing upon request.... Review on appeal [by the AFT committee] shall be limited to a determination of whether the President has met the nonprejudicial nondiscriminatory requirements.

USU Code § 5–6, p. 19. Plaintiff requested a hearing, was provided the same, and the AFT committee followed the Code's procedures by issuing its report and recommendation to the president. The AFT committee agreed with plaintiff's assertions that she had been "treated with prejudice and discrimination" and that the University had "violated her academic freedom." Whether or not the Code gives the AFT committee the authority to bind the University, however, must be determined.

Both parties agree that, pursuant to section 4–3.2 of the Code, the AFT committee is the

> administrative hearing body of the University with jurisdiction in matters related to academic freedom, tenure, promotion, dismissals and other sanctions, and actions alleged not to be in accordance with the adopted standards, policies, and procedures of the University. In meeting its jurisdiction, the committee may hear ... faculty petitions appealing an administrative decision.

USU Code § 4–3.2, p. 2.

Although section 5–6 describes the nonrenewal procedure and section 4–3.2 specifies the AFT grievance committee's jurisdiction, defendant correctly asserts that one must look to other provisions of the Code for a complete understanding of the nonrenewal procedures. *See Nielsen v. O'Reilly,* 848 P.2d 664, 665 (Utah 1992) (recognizing that courts must read contracts as a whole "in an attempt to harmonize and give effect to all ... the contract provisions").

Defendant correctly asserts that section 4–3.2 establishes the AFT committee as a standing committee of the Faculty Senate. Therefore, to understand the nature of the AFT committee's authority, one must understand the Faculty Senate's jurisdiction as outlined in section 4–3 of the Code. Section 4–3 reads in pertinent part:

> The Senate shall also have the following powers: To receive and consider reports from all faculty committees, councils, departments, divisions, administrative officers, colleges, and faculties, and to take appropriate action thereon within the scope of its authority; to consider matters of professional interest and faculty welfare and make recommendations to the President and other administrative officers concerned....
>
> All matters considered and approved by the Senate shall be forwarded to the President, and where he deems it necessary to the Institutional Council for approval or revision. *The President shall report back*

---

4. Plaintiff correctly asserts in her Reply Brief that unlike the present case, *Trolley Square* involves a commercial lease rather that an employment contract. Nonetheless, the rules of contract construction in *Trolley Square* apply equally here.

*to the Senate for his acceptance or rejection of these matters referred to him.*

USU Code § 4–3, p. 1. (emphasis added).[5]

Searching the "four corners" of the Code leads us to the conclusion that, absent any explicit language to the contrary, the president has the power to accept or reject recommendations of the AFT committee, including the decision not to renew plaintiff's contract. Plaintiff has correctly indicated that the term "appeal" is often used in explaining the AFT committee's appellate role. However, there is no language in the Code specifically indicating the effect of the "appellate review."[6] In lieu of such language, the term "appeal" may be used to denote many forms of review, including finding facts and making "recommendations" such as the AFT committee has done here pursuant to section 4–3.2.

Section 4–3.2(6)(b) further provides that "[g]rievance committees of the [AFT] Committee shall, when hearing grievances, ascertain that procedural due process was granted the petitioner." USU Code § 4–3.2(6)(b), p. 2. After a hearing, "[a] written report of the meetings held and a *recommendation* will be sent to the president." *Id.* (emphasis added). "In interpreting contracts, 'the ordinary and usual meaning of the words used is given effect.'" *Warburton v. Virginia Beach Fed. Sav. and Loan Assoc.*, 899 P.2d 779, 782 (Utah Ct.App.1995) (citation omitted). The only ordinary and usual definition of "recommend" that is contextually sound is to "advise" or "counsel." *See* Webster's Third New International Dictionary 1897 (1986). Thus, we affirm the district court's ruling that the University was not bound by the AFT committee's recommendation to the president.[7]

### B. Role of the Tenure Advisory Committee

 Plaintiff's second contention on appeal is that the district court failed to properly interpret the section of the Code regarding the TAC's role in the annual review of nontenured faculty.

As stated above, the president, with approval of the University's Board of Trustees, may "provide for the constitution, government, and organization of the faculty and administration, and enact implementing rules, including the establishment of a prescribed system of tenure." Utah Code Ann. § 53B–2–106(2)(b) (1997). The "prescribed system of tenure" is found in section 5–6 of the Code. It states that "[a]ny non-tenured faculty member whose annual appointment the administration wishes not to continue ... shall be given advance notice, in writing, by the president ... [n]ot later than March 1 of the first academic year of service if the appointment expires at the end of that year." USU Code § 5–6, p. 12. The president complied with this requirement when he sent plaintiff notice of his decision not to renew her contract on February 24, 1993.

Especially pertinent to plaintiff's claim is the portion of the Code providing that proceedings are not required to "terminate the employment of a non-tenured faculty member at the end of his contract period, by nonrenewal of his contract, except as hereinafter specified." USU Code § 5–6, p. 18. The next sentence states that "USU shall maintain an annual review procedure, recording the progress of non-tenured faculty members, *as the basis upon which to award or deny tenure.*" *Id.* at 19 (emphasis added).

---

**5.** Plaintiff correctly asserts that section 4–3 deals with the legislative and policy-making jurisdiction of the Senate. However, nowhere in the Code is there language giving the AFT committee adjudicative authority that is binding on the president.

**6.** The AFT committee functions more as a fact-finding body than as a traditional appellate reviewing body.

**7.** William F. Campbell, Chair of the AFT committee during the academic year 1992–1993, submitted an affidavit to the district court in support of

defendant's motion for summary judgment stating, in part, that "the AFT Committee's conclusions and findings [] are advisory to the University President. [AFT] grievance subcommittees make only a recommendation to the President. The President considers the recommendation in making his or her final decision, but is not bound by the recommendation." *Cf. R.O.A. General, Inc. v. Utah Dep't of Transp.*, 347 Utah Adv. Rep. 11, 12, 966 P.2d 840, 842 (Utah 1998) (explaining that an agency's interpretation of its own rules will be upheld "so long as that interpretation is 'reasonable and rational.'" (citation omitted)).

There is no mention of the TAC's involvement in the decision not to renew a faculty member's contract.

The Code then addresses the criteria and procedures for awarding tenure and promotion. "The Tenure Committee's evaluation of a first year candidate shall be forwarded by the department chairman to the dean no later than February 1." *Id.* at 11. Sorenson, the head of the Department of Health, Physical Education and Recreation, forwarded the TAC's progress report to the dean on February 12, 1993. The Code does not state, explicitly or implicitly, that the TAC must be consulted in any manner before terminating a nontenured faculty member. Further, plaintiff has made no showing that the eleven-day delay affected her in any way.

Accordingly, we hold that plaintiff's TAC performed its role during her employment at the University. Plaintiff was entitled to a review of her performance as the basis for decisions related to her tenure candidacy, but not for any decisions related to the nonrenewal of her appointment.

## V. CONCLUSION

First, we conclude that the district court correctly granted summary judgment for the University on the ground that the employment contract between plaintiff and the University unambiguously vested the president with the authority to disagree with the recommendations of the AFT committee related to nonrenewal of the contract of a nontenured faculty member. Second, we hold that the district court correctly granted summary judgment for the University on the ground that the TAC was given authority only regarding issues of tenure, not issues about nonrenewal of employment contracts of nontenured faculty members.

Affirmed.

WILKINS, Associate P.J., and BENCH, J., concur.